FILED

JUN 2 3 2021

U.S. DISTRICT COURT
EASTERN DISTRICT OF MO
ST. LOUIS

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. S1-4:20CR00557 HEA/NCC |
| | ) | |
| THOMAS HOBBS, D.C., | ) | |
| VIVIAN CARBONE-HOBBS, D.C., | ) | |
| CHRISTINE BARRERA, | ) | |
| ELIZABETH GUETERSLOH, | ) | |
| GLENDA JOHNSON, | ) | |
| SHEILA HUFFMAN, | ) | |
| SHANNON NENNINGER, | ) | |
| CLARISSA POGUE, | ) | |
| JAMES RALSTON, and | ) | |
| GARY WALESKY, | ) | |
| | ) | |
| Defendants. | ) | |

## SUPERSEDING INDICTMENT

The Grand Jury charges:

## BACKGROUND

### Defendants

1.      Defendant Thomas Hobbs, D.C. ("Dr. Hobbs"), has been a chiropractor licensed to practice in the state of Missouri since about 1982, but Dr. Hobbs has never had a license to practice medicine in Missouri or any other state. In Missouri, medical doctors may prescribe medications, perform surgery, and perform other diagnostic and treatment procedures that chiropractors are not authorized or licensed to perform. Since in or about 1999, Dr. Hobbs has owned and operated Power-Med, Inc. ("Power-Med"), currently located on Municipal Drive in the city of Arnold, in Jefferson County, Missouri.

2.      Defendant Vivian Carbone-Hobbs, D.C. ("Dr. Carbone-Hobbs"), the wife of Dr.

Hobbs, has been a chiropractor licensed to practice in the state of Missouri since 1989.

3.      Power-Med was incorporated in the state of Missouri on September 1, 1999 by Dr. Carbone-Hobbs. Dr. Hobbs, has served as the president of Power-Med since its inception. At times relevant to this Indictment, Dr. Carbone-Hobbs was a board member and the vice president of Power-Med.

4.      At all times relevant to this indictment, defendant CHRISTINE Barrera ("Barrera") was a resident of St. Louis City, Missouri and was the office manager of Power-Med.

5.      At all times relevant to this indictment, defendant Clarissa Pogue ("Pogue") was a resident of Jefferson County, Missouri and was a medical assistant and phlebotomist at Power-Med

6.      At times relevant to this indictment, defendant Elizabeth Guetersloh ("Guetersloh") was a resident of Jefferson County, Missouri and was employed at Anheuser Busch (referred to hereafter as "AB InBev").

7.      At times relevant to this indictment, defendant Glenda Johnson ("Johnson") was a resident of St. Louis County, Missouri and was employed at AB InBev.

8.      At times relevant to this indictment, defendant Sheila Huffman ("Huffman") was a resident of St. Charles County, Missouri.

9.      At times relevant to this indictment, defendant Shannon Nenninger ("Nenninger") was a resident of Jefferson County, Missouri and was employed at AB InBev.

10.      At times relevant to this indictment, defendant Gary Walesky ("Walesky") was a resident of St. Louis County, Missouri and was employed at AB InBev.

11.      At times relevant to this indictment, defendant James Ralston ("Ralston") was a

resident of St. Louis County, Missouri and was a former employee of AB InBev

12.     At times relevant to this indictment, Co-conspirator #1 was a resident of Jefferson County, Missouri and was an employee of AB InBev.

13.     At times relevant to this indictment, Co-conspirator #2 was a resident of St. Louis City, Missouri.

<u>**Description of Social Security Disability Program**</u>

14.     The Social Security Administration ("SSA") is a federal agency that administers social programs that provide retirement, survivor, and disability benefits to eligible individuals. SSA disability benefits, also known as "Title II" benefits, are paid from the Retirement/Survivors Trust Fund and the Disability Trust Fund. Individuals applying for SSA disability benefits are referred to herein as "applicants" or "claimants" and those receiving SSA disability benefits are referred to herein as "recipients."

15.     To be eligible for SSA benefits, an applicant must have paid sufficient Federal Insurance Contribution Act ("FICA ") taxes and have a sufficient number of quarters of coverage to qualify for monthly payments. Secondly, an "acceptable medical source" must certify that the applicant is unable to do any substantial gainful activity because of a medically determinable physical or mental impairment that can be expected to result in death or is expected to last for a continuous period of not less than 12 months.

16.     In Missouri, an acceptable medical source must submit the medical records of an applicant for SSA disability benefits to the Disability Determination Services ("DDS"), a Missouri state agency. DDS contracts with SSA to determine the eligibility of individuals applying for SSA disability benefits. DDS uses a five-step evaluation process to decide if an

individual is permanently disabled. DDS considers the applicant's current employment status, if

employed; whether the reported medical condition is expected to continue for at least 12 months

and significantly limits the applicant's ability to do basic work activities - including but not

limited to lifting, standing, walking, sitting, and remembering; and whether the reported medical

condition is so severe as to prevent a person from doing any substantial gainful activity. If the

applicant cannot do any work, DDS will decide that the applicant is disabled.

17.     Once the applicant is determined to be disabled, SSA sends the applicant an

award letter, notifying the applicant of the amount and the date monthly payments will begin.

Included within the award letter is the following notice:

> **We based our decision on information you gave us. If this information changes, it could affect your benefits. For this reason, it is important that you report changes to us right away.** We have enclosed a pamphlet, "What You Need To Know When You Get Social Security Disability Benefits." It tells you what you must report and how to report. Please be sure to read the parts of the pamphlet that tell you what to do if you go to work or your health improves. (emphasis added).

## COUNT 1
## CONSPIRACY
## 18 U.S.C. § 371

18.     Paragraphs 1 to 17 are incorporated by reference as if fully set out herein.

19.     Beginning in or about 2011, and continuing to in or about 2019, in the Eastern

District of Missouri and elsewhere,

THOMAS HOBBS, D.C.,
VIVIAN CARBONE-HOBBS, D.C.,
CHRISTINE BARRERA,
ELIZABETH GUETERSLOH,
GLENDA JOHNSON,
SHEILA HUFFMAN,
SHANNON NENNINGER,
CLARISSA POGUE,

4

JAMES RALSTON, and
GARY WALESKY,

the Defendants herein, and persons known and unknown to the Grand Jury, did unlawfully,

willfully, and knowingly combine, conspire, and agree with persons known and unknown to the

grand jury to commit the following offenses against the United States:

    a.    to defraud the United States by interfering with and obstructing the lawful

        governmental functions of the Social Security Administration through

        deceit, craft and trickery and by dishonest means;

    b.    to engage in a scheme to defraud the Social Security Administration, in

        violation of Title 42, United States Code, Section 408(a)(3);

    c.    to embezzle, steal, purloin, and knowingly convert to his or her use,

        money of the United States, in violation of Title 18, United States Code,

        Section 641;

    d.    to defraud and to obtain, by false and fraudulent representations, money

        owned by and under the control of a health care benefit program, in

        connection with the delivery and payment of health care benefits, items,

        and services, in violation of Title 18, United States Code, Section 1347;

        and

    e.    to knowingly transfer, possess, and use, without lawful authority, a means

        of identification of another person in connection with any unlawful

        activity that constitutes a violation of federal law or is a felony under state

        or local law, in violation of Title 18, United States Code, Section

5

1028(a)(7).

**Purpose of the Conspiracy**

20.     The purpose of the conspiracy was:

      a.      to pay Dr. Hobbs and Dr. Carbone-Hobbs to create and use, and to assist

their co-conspirators to create and use, documents that falsely described

the medical condition and functioning level of applicants for disability

benefits;

      b.      to submit the false and fraudulent documents to the SSA and other private

health and disability insurance companies and to cause these entities to

pay disability benefits; and

      c.      to submit claims and to receive reimbursement from health care benefit

programs for medically unnecessary and non-rendered services.

**Manner and Means of the Conspiracy**

21.     It was part of the conspiracy that Defendants and their co-conspirators interfered

and obstructed the SSA in its lawful functions of implementing and enforcing the regulations and

policies of the SSA. The interference and obstruction included Dr. Hobbs making false and

misleading representations concerning his professional qualifications and the Defendants and

their co-conspirators making false and fraudulent misrepresentations concerning the medical

conditions and functional limitations of SSA applicants. Additionally, the Defendants and their

co-conspirators concealed and failed to disclose material facts to private disability and health

insurance companies, although they had a duty to disclose these facts.

Dr. Hobbs' False Representations Related to His Medical Degree and License

22.     As stated above, SSA requires medical records and a certification by acceptable medical sources to be submitted as part of an application for SSA disability benefits. SSA defines "acceptable medical sources" to include, among others, licensed medical or osteopathic physicians, licensed optometrists, licensed podiatrists, licensed or certified psychologists, and speech therapists. Although licensed chiropractors are referred to as "Dr." or "doctor" and may properly use that title, SSA does not consider chiropractors, such as Dr. Hobbs and Dr. Carbone-Hobbs, to be acceptable medical sources in assessing permanent disability.

23.     Acceptable medical sources must list their credentials, titles, and/or license information on the medical records they submit to SSA. In so doing, the medical source attests that he or she is qualified and licensed in good standing and that the information provided is accurate. Because of the enormous volume of applications for disability benefits, it would be extremely time consuming and nearly impossible for SSA to verify the qualifications of all the medical sources submitting medical records and to verify the information contained in the medical records. Therefore, SSA and the agencies that SSA contracts with must rely on the information submitted by the medical sources to be accurate.

24.     It was part of the conspiracy that Dr. Hobbs took affirmative steps to mislead and deceive his patients, insurers, and regulatory agencies, including the SSA, into believing he was a licensed medical doctor. In his resume posted on the internet, Dr. Hobbs represented he had received a "Medical Doctor" degree in 2004 from the University of Health Sciences of Antigua ("UHSA") located in the British West Indies. However, Dr. Hobbs obtained this purported medical degree from UHSA by fraud and deceit. To obtain the UHSA degree, Dr. Hobbs falsely and fraudulently reported to UHSA that he had completed required clinical rotations, when he

7

had not.

25.     It was further part of the conspiracy that Dr. Hobbs listed on his resume: "2008 United States Medical License #06493522," to support his claim that he was a licensed medical doctor. But, Dr. Hobbs knew number 0-649-352-2 was not a medical license number. Rather, number 0-649-352-2 is an "Examinee ID" number which Dr. Hobbs was assigned when taking the United States Medical Licensing Examination ("USMLE"). The UMSLE is a three-step examination for medical licensure in the United States and is sponsored by the Federation of State Medical Boards and the National Board of Medical Examiners. The USMLE assesses a physician's ability to apply knowledge, concepts, and principles, and to demonstrate fundamental patient-centered skills, that are important in health and disease and that constitute the basis of safe and effective patient care. Dr. Hobbs has yet to pass the Step 3 examination of the UMSLE, and therefore, does not have a license to practice medicine in any state in the United States.

26.     According to the Federation of State Medical Boards, Dr. Hobbs did seek licensure as a medical doctor in the state of Florida. However, he did not meet the requirements and did not receive a Florida medical license. Further, the Missouri Division of Professional Registration records do not list Dr. Hobbs as a "Medical Physician and Surgeon."

27.     It was nonetheless part of the conspiracy that Dr. Hobbs repeatedly used number 0-649-352-2 and the initials "M.D." with the intent to mislead SSA, private disability and health insurance companies, and the public into believing he was a licensed medical doctor. Having unsuccessfully sought a medical license, Dr. Hobbs knew number 0-649-352-2 was not a medical license number.

28.     It was further part of the conspiracy that Dr. Hobbs identified himself as a

8

medical doctor and used "M.D." after his name on documents presented to SSA in support of applications for disability benefits. Dr. Hobbs submitted numerous medical records attesting to the disability of approximately 90 applicants, while fraudulently concealing and not disclosing to SSA that he was not a licensed medical doctor and did not otherwise qualify as a SSA acceptable medical source.

Dr. Hobbs' and Dr. Carbone-Hobbs' False Representations Concerning Applicants' Conditions

29.     As early as 2011, Dr. Hobbs had earned a reputation among employees at AB InBev for providing fraudulent medical leave slips. It was also well known among AB InBev employees that Dr. Hobbs would help them to fraudulently obtain disability payments from SSA and from private insurance carriers by exaggerating their medical conditions and their inability to care for themselves. Because of his success in getting AB InBev employees qualified for disability benefits, many of Dr. Hobbs' patients were referred by AB InBev employees who had received disability payments with Dr. Hobbs' assistance.

30.     It was further part of the conspiracy that Dr. Hobbs and SSA applicants agreed on the initial visit or a visit thereafter that the applicants would pay Dr. Hobbs and Power-Med thousands of dollars for providing medical records and other documents exaggerating the applicants' medical conditions and physical and mental functioning. The amounts varied over the years and the amount would be more or less depending on whether the applicants were applying for disability benefits from SSA and also from private disability insurance companies. The applicants were willing to pay large sums of money for Dr. Hobbs' assistance in obtaining SSA disability benefits, because a permanent disability determination by SSA was often the key to unlocking large disability payments from private disability insurance plans and companies.

31.     It was further part of the conspiracy that Dr. Hobbs and Dr. Carbone-Hobbs routinely ordered extensive diagnostic testing, including magnetic resonance imaging ("MRI scans"), computer tomography ("CT scans"), electromyography ("EMG"), cardiac tests and studies, ultrasounds, and blood tests, which had little or no relation to the specific complaints made by the applicants and in almost all instances were medically unnecessary. It was further part of the conspiracy that Dr. Hobbs ordered numerous imaging studies within very short time frames, solely for the purpose of building up the medical records.

32.     It was further part of the conspiracy that Dr. Hobbs and Dr. Carbone-Hobbs initiated and provided medically unnecessary chiropractic and other treatments, such as intravenous treatments and injections, to increase the applicants' chances of obtaining disability benefits.

33.     It was further part of the conspiracy that without performing a physical examination or performing a very cursory one, Dr. Hobbs and Dr. Carbone-Hobbs prescribed or issued canes, back braces, handicap parking tags, and TENS units to most applicants, to create the illusion that the applicants were disabled. Having no medical need for the equipment, many of the applicants did not use the equipment provided to them.

34.     It was further part of the conspiracy that Dr. Hobbs coached or had others, including defendants Pogue and Ralston, coach applicants on how to complete the SSA Form 3373 - Function Report ("Function Report"), wherein applicants had to describe their medical conditions and limitations. Applicants were required to sign the Function Report, containing the following statement: "To the best of my knowledge, the above statements are true." The following are some of the questions included in the Function Report that the applicants were

required to answer:

      a.     How do your illnesses, injuries, or conditions affect your ability to work?

      b.     Explain how your illnesses, injuries, or conditions affect your ability to dress, bathe, shave, feed yourself, or use the toilet?

      c.     List activities that you are able to do, including household chores, mowing, cleaning, shopping, etc.

      d.     Check and explain how your illnesses, injuries, or conditions affect your ability to perform the following: lifting, standing, bending, squatting, reaching, walking, sitting, kneeling, hearing, stair climbing, seeing, hearing, memory, completing tasks, concentration, understanding, following directions, using hands, and getting along with others. ("Activities").

      e.     Do you use any assistive devices, such as a cane, walker, or brace/splint?

35.     It was part of the conspiracy that each of the SSA recipients, discussed in paragraphs 47 to 138 of this indictment, stated in his or her SSA Function Report that an illness, injury, or condition adversely affected his or her ability to perform many of the Activities. Subsequent to receiving SSA benefits, each of these recipients was observed, and in some cases videotaped, while they were engaged in Activities that they told SSA they were unable to do. As of February 2019, although required to do so, none of these recipients had notified SSA of any improvement in their medical condition or in their ability to perform the Activities.

36.     It was further part of the conspiracy that Dr. Hobbs used templates in preparing his "Disability Determination" reports and Dr. Carbone-Hobbs also used a template in preparing

her "Report of Findings" and "Physical Medical Source Statements." The reports reflected little to no differences between the conditions and physical limitations reported for different applicants. Furthermore, the opinions of Dr. Hobbs and Dr. Carbone-Hobbs and the treatment records prepared by them were not consistent, as to the nature, severity, and functional limitations resulting from the applicants' impairments, when compared to the treatment records of other medical professionals who provided care to the same applicants.

Undercover Investigation

37.     As part of an undercover investigation, on February 12, 2019, an undercover FBI agent, using the name Tom Butler ("Butler") and posing as a prospective patient, called the Power-Med office to make an appointment. He told the person answering the phone that he worked for AB and AB employees had told him to ask for Dr. Hobbs. Butler was given an appointment to see Dr. Hobbs on February 14, 2019, just two days after he called Power-Med. The following paragraphs describe Butler's visit to Power-Med and summarized statements made by defendants Dr. Hobbs, Barrera, and Pogue during the visit.

38.     At the appointed time, Butler, equipped with video and audio recorders, went to the Power-Med office, where he met defendant Barrera, the office manager at Power-Med. Barrera gave Butler a brief overview of how Dr. Hobbs handled patients who wanted to go on disability. She stated that Dr. Hobbs was "pricey" and required a certain amount of money to start the process, and patients usually paid cash over a 4-6 month period. Barrera said Dr. Hobbs was "really, really good" at helping his patients get disability benefits; the one patient, who was denied disability benefits, admitted that he could drive, which indicated he was not disabled and might be able to work as a driver.

12

39.     After completing his paperwork, Butler met with Dr. Hobbs, who commented that he had helped a number of AB employees obtain disability benefits. Before any examination or inquiry about Butler's condition, Dr. Hobbs told Butler that the process would take six months. Dr. Hobbs told Butler he would have to be off work and under his care for three months. Dr. Hobbs further indicated that he would write a medical leave of absence note for Butler so AB would pay him while he was off work on short term disability.

40.     Dr. Hobbs told Butler: "You're going to be busy because I'm going to be running you to the imaging centers a lot for the first month. The first month is hectic. In here a lot, testing a lot." Dr. Hobbs further stated that he orders multiple MRIs, brain scans, x-ray, blood tests, and psychological evaluations on his patients seeking disability benefits, but told Butler his health insurance would cover these services.

41.     Dr. Hobbs explained to Butler that once he received his SSA disability benefits, he would then be able to receive as much as $100,000 in a lump sum from Met-Life or whatever company was providing the coverage to AB employees. Dr. Hobbs also told Butler he would continue to receive a monthly long-term disability payment of about $500 from AB, which would be in addition to the monthly SSA disability payment that Butler would receive. Dr. Hobbs emphasized that he was an expert and had a 99.999.99% success rate in having his patients qualified for SSA disability benefits.

42.     Dr. Hobbs told Butler to list him as his primary doctor on any forms that he completed although Butler would be seeing other doctors because he had "lots of doctors" on his staff. After asking Butler questions about his medical history, Dr. Hobbs told Butler that his employee Barrera would come in and tell him about the fees.

13

43.    Barrera gave Butler a document entitled "Disability Package Pricing" which

provided in part: "all patients applying for disability can expect the following fees:

| | |
|---|---|
| Social Security | $4000.00 |
| Short Term | $4000.00 |
| Prudential | $6000.00 |
| Long-term | $4000.00 |
| Psych Eval. | $1000.00 |
| 2 IV Packages | $2000.00 |
| | $21.600.00 |

| Additional Fees | |
|---|---|
| Form Fees | $125.00--$175.00 |
| Disability Plates | $125.00 |
| Insurance Policy | $1500.00" |

The fee agreement also provided: "I understand that I must put down a down payment of 50%

before services will be started and I further understand that all money owed must be paid in full

before final documents will be signed by the Doctor."

44.    Barrera told Butler that after the initial down payments, many patients paid on a

weekly basis, bringing in as much as they can and confirmed that the payments were to be made

in cash. Barrera agreed to accept $1000.00 cash from Butler, who indicated he would bring in

additional money at the next appointment on February 27, 2019.

45.    Barrera also told Butler that he would have to come in two days a week, on

Mondays for IVs because "it looks really, really good on your disability." She also stated that Dr.

Hobbs would send him out for four to five MRIs, which are done in the beginning "to go toward

documentation." Another Power-Med employee, defendant Pogue, told Butler that Dr. Carbone-

Hobbs would give him chiropractic adjustments during the same period he would be getting the MRIs.

46.     Defendant Pogue told Butler that he should continue to come in monthly after he began receiving his SSA disability because MetLife reviews every year and he could lose the $500 monthly disability payment if he stops treatment. The monthly office visit would cost $50. Both Pogue and Barrera told Butler to be careful, particularly about what he posts on Facebook.

Glenda Johnson, *AB In*Bev Employee

47.     At all relevant times, AB InBev provided long-term disability insurance benefits to employees through Prudential Insurance Company of America ("Prudential"). Under this plan, an employee would receive a long-term disability payment of $100,000.00 if the employee was determined to be totally disabled.

48.     It was part of the conspiracy that beginning on or about February 20, 2012, defendant Glenda Johnson ("Johnson") agreed to pay Dr. Hobbs for his assistance in fraudulently obtaining disability benefits from the SSA and Prudential. Beginning on or about February 20, 2012, Dr. Hobbs required Johnson to undergo medically unnecessary tests and treatments to bolster her application for disability benefits.

49.     It was further part of the conspiracy that beginning on or about September 11, 2012, Johnson and Dr. Hobbs falsely and fraudulently represented to the SSA that Johnson became totally and permanently disabled on May 5, 2011, and could no longer perform her duties as a bottler at AB InBev. Specifically, Johnson and Dr. Hobbs falsely represented that Johnson's medical condition caused her to be homebound, to need a cane, and to be unable to provide care for her pets, to assist with yard work, and to travel.

15

50.     It was further part of the conspiracy that between on or about May 5, 2011 and continuing to on or about April 30, 2020, Johnson concealed her ability to travel domestically and internationally, engage in household chores and yardwork, participate in physical activities without the assistance of a cane, and provide pet care.

51.     Relying on the false statements and misrepresentations of Johnson and Dr. Hobbs, the SSA determined that Johnson was eligible to receive SSA disability benefits. The effective date of the disability was determined to be September 14, 2012.

52.     Between on or about September 28, 2012 and on or about April 30, 2020, Johnson fraudulently received $202,527.60 in SSA disability benefits. After SSA deemed her disabled, Johnson applied for and thereafter, on January 15, 2013, received a $100,000 long-term disability payment from Prudential.   She also received $57,982.40 from Met-Life.

James *Williams, AB InBev* Employee

53.     From on or about March 3, 1988 to on or about March 31, 2011, conspirator James Williams was employed by AB InBev as a brewer.

54.     It was part of the conspiracy that beginning on or about April 8, 2011, Williams agreed to pay Dr. Hobbs to assist him in fraudulently obtaining disability benefit payments from the SSA and Prudential.

55.     It was further part of the conspiracy that on or about September 30, 2011, Williams, with the assistance of Dr. Hobbs, submitted an application for disability insurance benefits from the SSA, falsely stating that he became totally disabled on March 31, 2011.

56.     It was further part of the conspiracy that beginning on or about April 8, 2011 and continuing to on or about May 3, 2013, Dr. Hobbs required Williams to undergo medical tests

16

and treatments to bolster his applications for disability insurance benefits from the SSA and Prudential.

57.     It was further part of the conspiracy that on or about January 1, 2012, Dr. Hobbs instructed Williams to meet with defendant Ralston, a former AB InBev union representative, for assistance in fraudulently completing Prudential's long-term disability benefit application. On the same day, Williams paid Ralston $1,000.00 for his assistance in completing the long-term disability benefit application.

58.     From on or about April 29, 2011 and continuing to on or about September 15, 2017, Williams traveled internationally on approximately 14 occasions, performed yard work and automotive work on his car, washed vehicles, carried large objects, and engaged in other physical activities.

59.     It was part of the conspiracy that Williams, Ralston, and Dr. Hobbs made and caused to be made false and fraudulent representations to the SSA and Prudential concerning Williams' medical condition during this same time period, 2011 to 2017. Specifically, Williams and his co-conspirators falsely represented that his medical condition required that others assist him with personal care, household chores, and other activities, and further stated that he could not travel far from his home due to his medical condition.

60.     Based upon the false statements and misrepresentations to the SSA by Williams and Dr. Hobbs, the SSA determined Williams to be disabled, the effective date of disability being November 7, 2011.

17

61.     Between on or about November 7, 2011 and on or about February 28, 2019, Williams fraudulently received in excess of $150,000.00 in SSA disability insurance benefit payments.

62.     It was part of the conspiracy that on or about April 3, 2012, Williams received a disability benefit payment of $100,000.00 from Prudential. This payment was based on the medical attestations by Dr. Hobbs and the false and fraudulent long-term disability benefit application prepared by Williams and Ralston. Close to the time Williams received approval of the $100,000 from Prudential, Williams gave Dr. Hobbs $1,000 in cash, which Dr. Hobbs placed in his desk drawer.

63.     It was further part of the conspiracy that Dr. Hobbs advised Williams that, for the sake of appearances, Williams needed to continue monthly appointments at Power-Med for one to two years after he was deemed disabled by the SSA. Williams complied and underwent intravenous treatments at Power-Med until May 2013.

64.     It was further part of the conspiracy that beginning on or about May 2, 2011, Williams authorized Dr. Hobbs to submit medical insurance claims to his medical insurance carrier, Anthem Blue Cross Blue Shield of Missouri.

Gregory Vieth, AB InBev Employee

65.     From on or about February 1, 1977 to on or about January 31, 2012, Vieth was employed by AB InBev as an oiler.

66.     It was part of the conspiracy that on or about February 11, 2014, Vieth paid Dr. Hobbs $3,000.00 for his assistance in fraudulently obtaining disability benefit payments from the SSA.

67.     It was further part of the conspiracy that beginning on or about February 6, 2014 and continuing to on or about February 21, 2019, Dr. Hobbs required Vieth to undergo medically unnecessary medical tests and treatments to bolster his applications for disability benefits from the SSA and from Prudential.

68.     Between on or about January 31, 2014 and on or about February 28, 2019, Vieth traveled internationally approximately 10 times, fished, shoveled snow, and engaged in yardwork. For this same time period, Vieth and Dr. Hobbs made and caused to be made false and fraudulent representations to the SSA and Prudential concerning his medical condition. Specifically, Vieth and his co-conspirators falsely represented that Vieth's medical condition impaired his ability to complete yardwork, engage in social activities, attend church more than twice a month, lift, walk, reach, sit, bend, and bathe and dress without assistance.

69.     It was further part of the conspiracy that beginning on or about February 21, 2014, Vieth authorized Dr. Hobbs to submit medical insurance claims to his medical insurance carrier, Anthem Blue Cross Blue Shield of Missouri.

70.     It was further part of the conspiracy that on or about May 7, 2014, with the assistance of Dr. Hobbs and Ralston, Vieth submitted an application for disability insurance benefits to the SSA, falsely stating that he became totally disabled on February 1, 2014.

71.     It was further part of the conspiracy that prior to August 4, 2014, Vieth paid Ralston approximately $1500.00 for his assistance in helping him complete the Prudential disability application.

72.     Based upon Vieth's false statements and misrepresentations to the SSA and the false statements of Dr. Hobbs, on August 1, 2014, Vieth was deemed eligible to receive disability benefit payments from the SSA.

73.     It was part of the conspiracy that on or about August 4, 2014, Vieth paid Dr. Hobbs $3,000.00 for his assistance in fraudulently obtaining disability benefit payments from Prudential.

74.     It was further part of the conspiracy that on a date after August 4, 2014, Dr. Hobbs informed Vieth that he would need to continue to come in for monthly visits so that Dr. Hobbs could help him with any subsequent reviews conducted by the SSA.

75.     Between on or about August 4, 2014 and on or about February 28, 2019, Vieth fraudulently received in excess of $125,000.00 in SSA disability benefit payments.

76.     On or about October 21, 2014, Vieth received a disability benefit payment of $100,000.00 from Prudential. This payment was based on the medical attestations by Dr. Hobbs and the false and fraudulent long-term disability benefit application prepared by Vieth, Dr. Hobbs, and Ralston.

Gary Belcher. AB InBev Employee

77.     It was part of the conspiracy that beginning on or about October 2, 2013, Belcher agreed to pay Dr. Hobbs for his assistance in fraudulently obtaining disability benefit payments from the SSA and Prudential.

78.     It was further part of the conspiracy that beginning on or about October 2, 2013 and continuing to on or about July 26, 2017, Dr. Hobbs required Belcher to undergo medically

20

unnecessary medical tests and treatments to bolster his applications for disability insurance benefits from the SSA and Prudential.

79.   Between on or about September 1, 2013 and on or about June 30, 2017, Belcher participated in activities at a casino, engaged in yardwork, completed walking trails in excess of a mile without resting, bent, stretched, and engaged in other activities.

80.   It was further part of the conspiracy that for this same time period, Belcher and Dr. Hobbs made and caused to be made false and fraudulent representations to the SSA concerning Belcher's medical condition. Specifically, Belcher and his co-conspirators falsely represented that Belcher's medical condition impaired his ability to engage in social activities, walk more than a half mile, dress without the assistance of others, transfer unassisted from one location to another, and do yardwork.

81.   It was further part of the conspiracy that beginning on or about October 21, 2013, Belcher authorized Dr. Hobbs to submit medical insurance claims to his medical insurance carrier, Anthem Blue Cross Blue Shield of Missouri.

82.   It was further part of the conspiracy that on or about December 27, 2013, Belcher, with the assistance of Dr. Hobbs, submitted an application for disability insurance benefits from the SSA, falsely stating that he became totally disabled on June 15, 2013.

83.   Relying on the false statements and misrepresentations by Belcher and Dr. Hobbs, on February 19, 2014, Belcher was deemed eligible for federal disability insurance benefit payments from the SSA.

84.   Between on or about March 1, 2014 and on or about February 28, 2019, Belcher fraudulently received in excess of $150,000.00 in SSA disability benefit payments.

21

85.     It was further part of the conspiracy that on or about March 10, 2014, Belcher, with the assistance of Dr. Hobbs, submitted an application for long-term disability insurance benefits to Prudential, fraudulently alleging that he was unable to perform the essential functions of a bottler or any other occupation because of his inability to lift, squat, bend, stand, reach, walk, sit, kneel, hear, climb stairs, remember, complete tasks, concentrate, and follow instructions.

86.     Relying on the medical attestations by Dr. Hobbs and the false and fraudulent long-term disability benefit application prepared by Belcher and Dr. Hobbs, on or about May 16, 2014, Belcher received a disability benefit payment of $100,000.00 from Prudential.

Co-conspirator #1, AB InBev Employee

87.     It was part of the conspiracy that beginning on or about June 20, 2011, Co-conspirator #1 agreed to pay Dr. Hobbs for his assistance in fraudulently obtaining disability benefit payments from the SSA, Prudential, and other providers of disability benefit payments.

88.     It was further part of the conspiracy that beginning on or about June 20, 2011 and continuing to on or about February 21, 2019, Dr. Hobbs required Co-conspirator #1 to undergo medically unnecessary medical tests and treatments to bolster his applications for disability benefits from the SSA and from short-term and long-term disability benefits from private insurers.

89.     It was further part of the conspiracy that on or about June 26, 2011, Dr. Hobbs telephoned Co-conspirator #1 and advised him that he had incorrectly completed the Function Report because his responses were not strong enough to qualify him for Social Security disability benefits.

22

90.     It was further part of the conspiracy that on or about June 27, 2011, Co-conspirator #1 and Dr. Hobbs worked together to complete the Function Report and reported a reduced level of functioning and involvement in daily activities so that he would fraudulently qualify for the payment of Social Security disability payments.

91.     It was further part of the conspiracy that on or about September 1, 2011, Co-conspirator #1 met with Ralston, a former Anheuser Busch InBev union representative, to have Ralston assist him in completing the disability applications for Prudential and other providers of disability benefits. At the meeting, Co-conspirator #1 gave Ralston approximately $3,000.00 for his assistance in completing the various disability benefit applications.

92.     Between on or about March 17, 2011 and continuing to on or about January 31, 2020, Co-conspirator #1 traveled internationally and domestically, performed household chores, visited casinos, fished, and boated.

93.     It was further part of the conspiracy that between on or about June 27, 2011 and continuing to on or about January 31, 2020, Co-conspirator #1, Ralston, and Dr. Hobbs made and caused to be made false and fraudulent representations to the SSA, Prudential, and other providers of disability benefits and concealed material information concerning his medical condition, his ability to engage in hobbies and activities, his ability to provide personal care, and his mental condition.

94.     It was further part of the conspiracy that beginning on or about June 20, 2011, Co-conspirator #1 authorized Dr. Hobbs to submit medical insurance claims to his medical insurance carrier, Anthem Blue Cross Blue Shield of Missouri.

95.     It was further part of the conspiracy that on or about June 27, 2011, Co-

23

conspirator #1, with the assistance of Dr. Hobbs, submitted an application for disability

insurance benefits from the SSA, falsely stating that he became totally disabled on March 17,

2011.

       96.    Relying on the false statements and misrepresentations by Dr. Hobbs and Co-

conspirator #1, on August 9, 2011, the SSA determined that Co-conspirator #1 was eligible to

receive disability benefit payments from the SSA.

       97.    Between on or about October 1, 2011 and continuing to on or about January 31,

2020, Co-conspirator #1 fraudulently received $257,792.80 in SSA disability benefit payments.

       98.    Based upon the medical attestations by Dr. Hobbs and the false and fraudulent

long-term disability benefit application prepared by Co-conspirator #1 and Ralston, on or about

October 25, 2011, Co-conspirator #1 received a disability benefit payment of $100,000.00 from

Prudential.

       99.    It was further part of the conspiracy that Co-conspirator #1 continued to pay Dr.

Hobbs for his assistance until February 14, 2019, to insure he would continue to receive

disability benefit payments from other providers.

Co-Conspirator #2

       100.    Between on or about May 1, 2018 and continuing to October 1, 2019, Co-

conspirator # 2 worked as a bartender, lifted large items, stood for long periods of time,

completed financial transactions, interacted with bar patrons, climbed stairs without assistance,

walked more than 40 to 50 feet, and provided care for her pets

       101.    It was part of the conspiracy that on or about August 27, 2018, Co-conspirator # 2

agreed to pay Dr. Hobbs $8,500.00 for his assistance in helping her to fraudulently obtain

disability benefit payments from the SSA.

102.    It was further part of the conspiracy that beginning on or about August 27, 2018 and continuing to on or about June 9, 2019, Dr. Hobbs required Co-conspirator # 2 to undergo medically unnecessary medical tests and treatments to bolster her application for disability benefits from the SSA.

103.    It was further part of the conspiracy that on or about January 10, 2019, Dr. Hobbs required Co-conspirator # 2 to work with one of his employees, defendant Pogue, to complete a fraudulent Function Report for the SSA.

104.    It was further part of the conspiracy that between on or about January 10, 2019, and continuing to on or about February 4, 2019, Co-conspirator # 2, Dr. Hobbs, and Pogue made and caused to be made false and fraudulent representations to the SSA. Specifically, Co-conspirator # 2 and her co-conspirators falsely represented that Co-conspirator # 2's medical condition impaired her ability to work, stand for more than 20 minutes, concentrate, lift more than 5 pounds, handle financial transactions, and to spend time with others.

105.    It was further part of the conspiracy that beginning on or about August 27, 2018, Co-conspirator # 2 authorized Dr. Hobbs to submit medical insurance claims to her medical insurance carrier, United Health Care.

106.    It was further part of the conspiracy that on or about January 10, 2019, with the assistance of Dr. Hobbs and Pogue, Co-conspirator # 2 submitted an application for disability insurance benefits to the SSA, fraudulently alleging that she became totally disabled on July 5, 2018.

107.    It was further part of the conspiracy that on or about January 10, 2019, with the

25

assistance of Dr. Hobbs and Pogue, Co-conspirator # 2 submitted a Function Report to the SSA, falsely stating that it took longer for her to dress and bathe as a result of her medical condition and that her medical condition prevented her from standing for long periods of time, completing any household chores, leaving her home for anything other than doctors' appointments and short periods of time, driving for more than 30 minutes at a time, sitting for longer than 20 minutes, walking for more than 40 to 50 feet before needing to rest, and spending time with others.

108.    It was further part of the conspiracy that on or about January 10, 2019, Dr. Hobbs and Co-conspirator # 2 falsely represented to the SSA that her medical condition prevented her from working and required that she have complete rest. Further, they asserted that she needed a strap brace, a TENS unit, and a cane.

109.    After a federal search warrant was executed at Power-Med in February 2019, Co-conspirator #2 was advised on March 1, 2019 by defendant Barrera that Dr. Hobbs was being investigated. Pogue strongly suggested that Co-conspirator #2 quit her bartending job. Dr. Carbone-Hobbs also told Co-conspirator #2 not to do yard work, grocery shopping, and any lifting because someone could be watching.

110.    Relying on the false statements and misrepresentations of Co-conspirator # 2 and Pogue and the false medical attestations of Dr. Hobbs, on March 19, 2019, the SSA determined that Co-conspirator # 2 was eligible to receive disability benefit payments from the SSA.

111.    Between on or April 2, 2019 and continuing to on or about October 9, 2019, Co-conspirator # 2 fraudulently received in excess of $10,000.00 in SSA disability benefit payments.

112.    It was further part of the conspiracy that on or about July 16, 2019, Barrera, on behalf of Dr. Hobbs, informed Co-conspirator # 2 that she had to submit updated information to

26

Lincoln Financial Group concerning her long-term disability benefits. Barrera stated that she could assist Co-conspirator #2 in submitting the update for approximately $575.00.

Sheila Huffman

113.    It was part of the conspiracy that on or about July 20, 2016, defendant Huffman, a registered nurse, sought the assistance of Dr. Hobbs, in fraudulently obtaining disability benefits from the SSA, as well as disability insurance payments from other disability insurance programs.

114.    It was further part of the conspiracy that Dr. Hobbs required Huffman to undergo medically unnecessary tests and treatments that would be used to bolster her applications for disability benefit payments.

115.    It was further part of the conspiracy that on or about November 22, 2016, Huffman submitted to the SSA a Function Report, wherein she falsely claimed that daily pain and weakness prevented her from caring for her pets or preparing meals. She also falsely claimed that she limited her social activities to her home and that she was only able to walk short distances on level ground.

116.    It was further part of the conspiracy that between July 20, 2016 and January 31, 2020, Huffman concealed from SSA and private health and disability insurance companies that she was able to, and actually did, travel domestically and internationally, complete household chores and yardwork, care for her pets, and visit casinos.

117.    Relying on the false statements and misrepresentations by Huffman and Dr. Hobbs, the SSA deemed Huffman to be totally and permanently disabled on December 23, 2016.

118.    As a result of the false statements and misrepresentations by Huffman and Dr. Hobbs, Huffman fraudulently received $65,440.00 in disability benefits from the SSA between

27

January 1, 2017 and January 31, 2020.

119.     Huffman's false statements and misrepresentation also caused Sun Life Financial, doing business as Assurant Employee Benefit Disability Insurance Program, to pay her $8,712 in short-term disability benefits.

Elizabeth Guetersloh, InBev Employee

120.     It was part of the conspiracy that on or about January 22, 2013, defendant Guetersloh sought the assistance of Dr. Hobbs, in fraudulently obtaining disability benefits from the SSA.

121.     It was further part of the conspiracy that Dr. Hobbs required Guetersloh to undergo medically unnecessary tests and treatments that would be used to bolster her application for disability benefit payments.

122.     It was further part of the conspiracy that on or about June 6, 2013, Guetersloh submitted to the SSA a Function Report, wherein she falsely stated that her medical condition made it difficult for her to take care of herself and she needed personal care, needed a brace and cane at times, and had "very little social life cause I can't do a lot of things." In the remarks section of the report, Guetersloh stated, "Due to my conditions it keeps me from having a quality life, some of my doctors said I needed to apply for disability."

123.     It was further part of the conspiracy that Guetersloh and Dr. Hobbs concealed from SSA and private health and disability insurance companies that Guetersloh was able, and did participate in, the activities she falsely indicated in the Function Report that she was unable to do, including traveling. Additionally, Guetersloh was observed riding a carousel holding a child on a horse (exiting the carousel unassisted), shopping without assistance and moving a

28

large frozen turkey with one hand from the cooler into her shopping cart, and loading the purchased items from the cart to the back of her vehicle requiring her to reach, lift, and carry. She was also observed driving for one hour and 15 minutes to a farm in Murphysboro, Illinois, urinating without assistance in open farm land (requiring her to squat), and walking several blocks to Fox Theater without assistance to attend a musical.

124.    Relying on the false statements and misrepresentations by Guetersloh and Dr. Hobbs, the SSA deemed Guetersloh to be totally and permanently disabled on August 6, 2013. After SSA deemed her disabled, Guetersloh applied for and thereafter, on or about November 26, 2013, received a $100,000 long-term disability payment from Prudential. She also fraudulently received $59,604.82 from Met-Life in short-term and long-term disability benefits.

125.    As a result of Guetersloh's false statements and misrepresentations of material facts, she fraudulently received $194,310.60 in government funds between August 2013 and April 2020.

Shannon Nenninger. AB InBev Employee

126.    It was part of the conspiracy that on or about January 8, 2013, defendant Nenninger sought the assistance of Dr. Hobbs, in fraudulently obtaining disability benefits from the SSA.

127.    It was further part of the conspiracy that Dr. Hobbs required Nenninger to undergo medically unnecessary tests and treatments that would be used to bolster her application for disability payments.

128.    It was further part of the conspiracy that on or about June 10, 2013, Nenninger submitted to the SSA a Function Report, wherein she falsely stated that she used a cane daily,

could not stand long, was unable to do household chores, and was only able to shop twice a month and not for very long. In the remarks section of the report, Nenninger stated, "My doctor Nicole Baker, Dr. Thomas Hobbs, its time for me to apply for disability."

129.     It was further part of the conspiracy that Nenninger and Dr. Hobbs concealed from SSA and private health and disability insurance companies that Nenninger was able, and did participate in, all the activities she falsely indicated in the Function Report that she was unable to do, including domestic and international travel. During the fall of 2015, Nenninger was observed riding on the back of a motorcycle and/or wearing a motorcycle helmet, cleaning and vacuuming the interior of her vehicle and on several occasions cleaning the wheels of her vehicle. During 2017, Nenninger was observed walking without a cane, regularly leaving her residence in her vehicle, walking her two dogs (sometimes twice daily), doing yard work for approximately two hours and 30 minutes, cutting the lawn with a push mower or riding mower, and using the leaf blower and weed eater. On one occasion, Nenninger was observed driving approximately one hour to Troy, Missouri to attend a baseball game and observed at the baseball field sitting, standing, walking, climbing up and down stairs, and lifting and carrying a lawn chair over her shoulder.

130.     Relying on the false statements and misrepresentations by Nenninger and Dr. Hobbs, the SSA deemed Nenninger to be totally and permanently disabled on March 2, 2015.

131.     As a result of Nenninger's false statements and misrepresentations of material facts, she fraudulently received $266,898.50 in SSA disability payments between August 2013 and April 2020. Nenninger also applied for and on or about January 27, 2014, received a $100,000 long-term disability payment from Prudential. She also fraudulently received

$57,788.44 from Met-Life in short-term and long-term disability benefits.

Gary Walesky, AB InBev employee

132.    It was part of the conspiracy that on or about June 8, 2012, defendant Walesky sought the assistance of Dr. Hobbs in fraudulently obtaining disability benefits from the SSA.

133.    It was further part of the conspiracy that Dr. Hobbs required Walesky to undergo medically unnecessary tests and treatments that would be used to bolster his application for disability payments.

134.    It was further part of the conspiracy that on or about August 13, 2012, Walesky submitted to the SSA a Function Report, wherein he falsely stated that he does not "get out much" and "Don't feel good enough to go out most of the time"; does not do chores, including yard work; can only lift under 20 pounds and walk ½ block before needing a five to 10 minute rest; and only shops two times a month. In the remarks section of the report, Walesky stated "Dr. Hobbs has advised me it was time to apply for disability."

135.    It was further part of the conspiracy that Walesky and Dr. Hobbs concealed from SSA and private health and disability insurance companies that Walesky was able, and did do, the activities he falsely indicated in the Function Report that he was unable to do. Walesky was observed on multiple occasions going to a bar, called the 19th Hole, staying for hours and sitting on a bar stool and observed on several occasions during the day leaving his residence to shop, travel to a restaurant and bar, and pump gas into his vehicle.

136.    Relying on the false statements and misrepresentations by Walesky and Dr. Hobbs, the SSA deemed Walesky to be totally and permanently disabled on September 10, 2012. After SSA deemed him disabled, Walesky applied for and thereafter, on or about November 6,

31

2012, received a $100,000 long-term disability payment from Prudential.

137.     As a result of Walesky's false statements and misrepresentations of material facts, he fraudulently received $222,235.80 in SSA disability payments between August 2011 and April 2019.

Dr. Hobbs' Used the Identifiers of Other Persons

138.     It was part of the conspiracy that Dr. Hobbs provided intravenous treatments and other treatments to patients applying for disability benefits. Dr. Hobbs could not order certain pharmaceutical products and medications because only a licensed medical doctor could order these products. To obtain the products, Dr. Hobbs entered into an agreement with Doctor #1, a licensed medical doctor, who ordered the products in his name. Doctor #1 did not evaluate the patients' need for the products, prescribe the products, nor administer the products to the patients.

139.     It was further part of the conspiracy that Dr. Hobbs signed and caused the name, DEA Number, and medical license number of Doctor #1 to be signed on the orders and prescriptions sent to the pharmacies supplying the pharmaceutical products.

Loss resulting from the Conspiracy

140.     As a result of the conspiracy described above, the SSA and private disability and health care insurance companies paid the Defendants and their co-conspirators over $12 million doctors based on false and fraudulent documents the Defendants and their co-conspirators created and submitted to the SSA and the insurers. Employers, such as AB InBev, also suffered a financial loss because of the increased costs of providing and maintaining the employer-supported disability plans.

**Overt Acts**

141.     In furtherance of the conspiracy and to affect the objects of the conspiracy, the
following overt acts, among others, were committed in the Eastern District of Missouri:

a.     On or about October 25, 2017, conspirator James Williams obtained a
disability insurance payment in the amount of $1,832.60 from the Social
Security Administration.

b.     On or about August 15, 2016, Dr. Carbone-Hobbs signed paperwork for
defendant Huffman to obtain short-term disability payments from Assurant.

c.     On or about August 22, 2016, Dr. Carbone-Hobbs signed a physician source
statement, indicating defendant Huffman "Not returning to work at this
time/Unsafe to herself and her patients."

d.     On or about January 8, 2016, Vieth and Dr. Hobbs received payment from
Anthem Blue Cross Blue Shield of Missouri based upon a fraudulently
submitted medical claim.

e.     On or about July 26, 2017, Belcher fraudulently obtained a disability
insurance payment in the amount of $1,935.40 from the SSA.

f.     On or about April 26, 2018, Dr. Carbone-Hobbs signed a physician medical
source statement indicating Co-conspirator #3's medical condition,
including balance issues, made it unsafe for her to work

g.     On or about May 17, 2018, Dr. Carbone-Hobbs signed a physician medical
source statement indicating Co-conspirator #3's medical condition
prevented her from performing the duties of her occupation and unsafe for

her to work.

h.    On or about February 8, 2017, Co-conspirator #1 fraudulently obtained a disability insurance payment in the amount of $2,046.50 from the SSA.

i.    In or about August 2018, defendant Walesky referred Co-conspirator # 2 to Dr. Hobbs.

j.    On or about February 14, 2019, defendant Barrera received $1000 from an FBI agent, posing as a patient.

k.    On or about September 25, 2019, defendant Nenninger fraudulently obtained a disability insurance payment in the amount of $1926.90 from the SSA.

All in violation of Title 18, United States Code, Section 371.

## Counts 2-14
## Health Care Fraud Scheme
## 18 U. S. C. §§ 1347 and 2

142.    Paragraphs 1 to 17 and 21 to 141 are incorporated by reference as if fully set out herein.

143.    On or about the dates listed below, in the Eastern District of Missouri,

THOMAS HOBBS, D.C.,
VIVIAN CARBONE-HOBBS, D.C.,
CHRISTINE BARRERA,
ELIZABETH GUETERSLOH,
GLENDA JOHNSON,
SHEILA HUFFMAN,
SHANNON NENNINGER,
CLARISSA POGUE,
JAMES RALSTON, and
GARY WALESKY,

34

the defendants herein, knowingly and willfully executed and attempted to execute, the above described scheme or artifice to defraud health care benefit programs, in connection with the delivery and payment for health care benefits, items, and services, that is, the defendants submitted, and caused to be submitted, false reimbursement claims for services or items that they knew were medically unnecessary, provided by an unqualified person, and were not rendered.

| Count | Patient/Recipient | Date of Claim | Insurance Company |
|-------|-------------------|---------------|-------------------|
| 2 | Co-conspirator # 2 | 10/20/2018 | United Health Care/Optum |
| 3 | Co-conspirator # 2 | 11/26/2018 | United Health Care/Optum |
| 4 | Co-conspirator # 2 | 12/13/18 | United Health Care/Optum |
| 5 | Co-conspirator # 2 | 1/10/2019 | United Health Care/Optum |
| 6 | Sheila Huffman | 8/2/2016 | United Health Care/Optum |
| 7 | Sheila Huffman | 11/30/2016 | Anthem/ Blue Cross Blue Shield |
| 8 | Shannon Nenninger | 8/10/2016 | Anthem/ Blue Cross Blue Shield |
| 9 | Gregory Vieth | 10/27/2015 | Anthem/ Blue Cross Blue Shield |
| 10 | Gregory Vieth | 11/25/2015 | Anthem/ Blue Cross Blue Shield |
| 11 | Gregory Vieth | 12/21/2015 | Anthem/Blue Cross Blue Shield |
| 12 | Susan Schmitz | 1/24/2018 | Anthem/Blue Cross Blue Shield |
| 13 | Susan Schmitz | 2/10/2018 | Anthem/Blue Cross Blue Shield |
| 14 | Susan Schmitz | 2/26/2018 | Anthem/Blue Cross Blue Shield |

All in violation of Title 18, United States Code, Sections 1347 and 2.

## Counts 15-16
## Theft of Government Funds
## 18 U. S. C. §§ 641 and 2

144.    Paragraphs 1 to 17 and 21 to 141 are incorporated by reference as if fully set out

herein.

145.    On or about the dates listed below, in the Eastern District of Missouri, the

defendants,

THOMAS HOBBS, D.C.,
VIVIAN CARBONE-HOBBS, D.C.,
CHRISTINE BARRERA,
CLARISSA POGUE, and
JAMES RALSTON,

did cause the embezzlement, theft, purloining, and conversion to the use of another, money of

the United States or of any department or agency thereof, or any property made or being made

under contract for the United States or any department or agency thereof, that being, a Social

Security disability payment in the amounts listed below:

| Count | SSA Recipient | Date of SSA Payment | Amount of SSA Payment |
|-------|---------------|---------------------|------------------------|
| 15    | Gary Belcher  | 6/28/17             | $1,935.40              |
| 16    | Gregory Vieth | 11/21/18            | $2,282.00              |

All in violation of Title 18, United States Code, Sections 641 and 2.

### Counts 17-18
### Theft of Government Funds
### 18 U. S. C. §§ 641 and 2

142.     Paragraphs 1 to 17 and 21 to 141 are incorporated by reference as if fully set out herein.

143.     On or about the dates listed below, in the Eastern District of Missouri, the defendants,

THOMAS HOBBS, D.C.,
VIVIAN CARBONE-HOBBS, D.C.,
and JAMES RALSTON,

did cause the embezzlement, theft, purloining, and conversion to the use of another, money of the United States or of any department or agency thereof, or any property made or being made under contract for the United States or any department or agency thereof, that being, a Social Security disability payment in the amounts listed below:

| 17 | James Williams | 9/27/17 | $1,832.60 |
| 18 | Co-conspirator # 1 | 11/10/15 | $2,074.80 |

All in violation of Title 18, United States Code, Sections 641 and 2.

### Count 19
### Theft of Government Funds
### 18 U. S. C. §§ 641 and 2

144.     Paragraphs 1 to 17 and 21 to 141 are incorporated by reference as if fully set out herein.

145.     On or about May 8, 2019, in the Eastern District of Missouri, the defendants,

37

THOMAS HOBBS, D.C.,
VIVIAN CARBONE-HOBBS, D.C.,
CHRISTINE BARRERA, and
CLARISSA POGUE,

did cause the embezzlement, theft, purloining, and conversion to the use of another, money of

the United States or of any department or agency thereof, or any property made or being made

under contract for the United States or any department or agency thereof, that being, a Social

Security disability payment made payable to Co-conspirator #2 in the amount of $1,226.00.

In violation of Title 18, United States Code, Sections 641 and 2.

### Count 20
### Theft of Government Funds
### 18 U. S. C. §§ 641 and 2

146.    Paragraphs 1 to 17 and 21 to 141 are incorporated by reference as if fully set out

herein.

147.    On or about April 11, 2018, in the Eastern District of Missouri, the defendant,

ELIZABETH GUETERSLOH,

did embezzle, steal, purloin, and knowingly convert to the use of another, money of the United

States or of any department or agency thereof, or any property made or being made under

contract for the United States or any department or agency thereof, that being, a Social Security

disability payment in the amount of $2,134.30.

In violation of Title 18, United States Code, Sections 641 and 2.

38

### Count 21
### Theft of Government Funds
### 18 U. S. C. §§ 641 and 2

148.    Paragraphs 1 to 17 and 21 to 141 are incorporated by reference as if fully set out herein.

149.    On or about September 12, 2018, in the Eastern District of Missouri, the defendant,

SHEILA HUFFMAN,

did embezzle, steal, purloin, and knowingly convert to the use of another, money of the United States or of any department or agency thereof, or any property made or being made under contract for the United States or any department or agency thereof, that being, a Social Security disability payment in the amount of $1,806.00.

In violation of Title 18, United States Code, Sections 641 and 2.

### Count 22
### Theft of Government Funds
### 18 U. S. C. §§ 641 and 2

150.    Paragraphs 1 to 17 and 21 to 141 are incorporated by reference as if fully set out herein.

151.    On or about July 26, 2016, in the Eastern District of Missouri, the defendant,

GLENDA JOHNSON,

did embezzle, steal, purloin, and knowingly convert to the use of another, money of the United States or of any department or agency thereof, or any property made or being made under contract for the United States or any department or agency thereof, that being, a Social Security disability payment in the amount of $1,615.80.

In violation of Title 18, United States Code, Sections 641 and 2.

### Count 23
### Theft of Government Funds
### 18 U. S. C. §§ 641 and 2

152.    Paragraphs 1 to 17 and 21 to 141 are incorporated by reference as if fully set out herein.

153.    On or about December 27, 2017, in the Eastern District of Missouri, the defendant,

### SHANNON NENNINGER,

did embezzle, steal, purloin, and knowingly convert to the use of another, money of the United States or of any department or agency thereof, or any property made or being made under contract for the United States or any department or agency thereof, that being, a Social Security disability payment in the amount of $1,785.60.

In violation of Title 18, United States Code, Sections 641 and 2.

### Count 24
### Theft of Government Funds
### 18 U. S. C. §§ 641 and 2

154.    Paragraphs 1 to 17 and 21 to 141 are incorporated by reference as if fully set out herein.

155.    On or about September 12, 2018, in the Eastern District of Missouri, the defendant,

### GARY WALESKY,

did embezzle, steal, purloin, and knowingly convert to the use of another, money of the United States or of any department or agency thereof, or any property made or being made under contract for the United States or any department or agency thereof, that being, a Social Security disability payment in the amount of $1,978.80.

In violation of Title 18, United States Code, Sections 641 and 2.

## FORFEITURE ALLEGATION

The Grand Jury further finds by probable cause that:

1.      Pursuant to Title 18, United States Code, Sections 982(a)(7), upon conviction of an offense of Title 18, United States Code, Section 1347, including conspiracy to commit such offenses, as set forth in Counts 1, and 2 through 14, the defendant(s) shall forfeit to the United States of America any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense. Subject to forfeiture is a sum of money equal to the total value of any property, real or personal, constituting or derived from any proceeds traceable to said offense.

2.      Pursuant to Title 18, United States Code, Sections 981(a) and Title 28, United States Code, Section 2461(c), upon conviction of an offense in violation of Title 18, United States Code, Section 641, as set forth in Counts 15 to 24, the defendant(s) shall forfeit to the United States of America any property, real or personal, constituting or derived from any proceeds traceable to said offense. Subject to forfeiture is a sum of money equal to the total value of any property, real or personal, constituting or derived from any proceeds traceable to said offense.

3.      If any of the property described above, as a result of any act or omission of the defendant(s):

          a.       cannot be located upon the exercise of due diligence;

          b.       has been transferred or sold to, or deposited with, a third party;

          c.       has been placed beyond the jurisdiction of the court;

          d.       has been substantially diminished in value; or

      e.      has been commingled with other property which cannot be divided

without difficulty,

the United States of America will be entitled to the forfeiture of substitute property pursuant to

Title 21, United States Code, Section 853(p).

                          A TRUE BILL.


                          _____

                          FOREPERSON

SAYLER A. FLEMING
United States Attorney


_____

TRACY L. BERRY, 014753 TN
Assistant United States Attorney

42